UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ISAK FRIEDMAN,                      )
                                    )
                Plaintiff,          )
                                    )
        v.                          )    No.  4:04CV1639 FRB
                                    )
JO ANNE B. BARNHART, Commissioner   )
of Social Security,                 )
                                    )
                Defendant.          )

<u>**MEMORANDUM AND ORDER**</u>

This cause is before the Court on plaintiff's appeal of an adverse ruling of the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On April 2, 1997, on an application for childhood Supplemental Security Income (SSI) pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, <u>et</u> <u>seq.</u>, the Social Security Administration (SSA) determined that plaintiff Isak Friedman was disabled due to anxiety related disorders and affective mood disorder, with an onset date of February 1, 1997, and awarded plaintiff benefits. (Tr. 56.) At the time of this determination, plaintiff was twelve years of age, with a birthdate of July 27, 1984. The application for benefits was filed on plaintiff's behalf by Paul Friedman (Mr. Friedman), plaintiff's grandfather. (<u>Id.</u>)

In a letter dated July 17, 2002, the SSA notified Mr. Friedman of its obligation to review cases of those individuals receiving disability benefits to determine whether such individuals continue to be eligible for benefits. (Tr. 545-47.) Mr. Friedman was subsequently notified that because plaintiff had recently attained eighteen years of age, such review for benefits would be conducted by applying the same rules applied to adults who file new claims for benefits. (Tr. 543.) On December 6, 2002, the SSA notified Mr. Friedman that it had determined that plaintiff no longer qualified for SSI benefits and that plaintiff would receive his final payment in February 2003. (Tr. 519-22.) In its notice to Mr. Friedman, the SSA indicated that it determined plaintiff's disability to cease effective December 15, 2002. (Tr. 523.)

Upon plaintiff's request for reconsideration of the SSA's adverse determination, the matter was presented to a Disability Hearing Officer who conducted a hearing on May 27, 2003, at which plaintiff, his grandfather, and his case manager from Regional Center were present and testified. The hearing officer issued a written decision on May 30, 2003, finding plaintiff not to be disabled. (Tr. 485-95.) At plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on January 7, 2004, at which plaintiff testified and was represented by counsel. Plaintiff's grandfather also testified at the hearing. (Tr. 31-55.) On May 27, 2004, the ALJ issued a decision in which he

determined plaintiff not to be disabled at any time since December 15, 2002. (Tr. 8-28.) On September 24, 2004, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 3-6.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  Hearing Before the ALJ

A.  <u>Plaintiff's Testimony</u>

At the hearing on January 7, 2004, plaintiff testified in response to questions posed by the ALJ and counsel. At the time of the hearing, plaintiff was nineteen years of age. Plaintiff lives in a house with his grandparents and two sisters. Plaintiff's grandparents are his legal guardians and he has lived with them since he was in the third grade. (Tr. 35.) Plaintiff graduated from high school and attended special education classes throughout his high school years. (Tr. 36.) Plaintiff attended seamanship school in the State of Maryland in November 2003 for one and one-half weeks. (Tr. 36-37.)

Plaintiff testified that he worked as a busboy at Marciano's Restaurant in either 2000 or 2001 and was fired after two months for not doing his job. Plaintiff testified that he was able to obtain the job in the first instance because of the relationship between the manager of the restaurant and his grandparents. (Tr. 40-41.)

Plaintiff testified that he previously worked as an

intern with Barlow Productions, a television/video production company, for approximately one year.  Plaintiff testified that MERS Goodwill paid him minimum wage during his internship, but that he also worked on individual projects for which Barlow compensated him.  Plaintiff testified that his internship ended approximately sixteen months prior, but that he continues to go to Barlow approximately twenty hours a week to develop video games. Plaintiff testified that he would like to go to Barlow every day but that the vice president there limits his time.  (Tr. 44-48.)

Plaintiff testified that the seamanship program which he attended in November 2003 was a seven- to nine-month program and was intended to lead to a job in the Merchant Marines.  Plaintiff testified that he was terminated from the program after one and one-half weeks, however, due to fighting and "goofing off."  (Tr. 37-39, 49.)  Plaintiff testified that he then returned to live with his grandparents and has not attended any school since that time. (Tr. 39.)

Plaintiff testified that he does not have any sleeping difficulty and that he goes to sleep when he is tired, which is around 2:00 a.m.  Plaintiff testified that he awakens at approximately 9:00 or 10:00 a.m.  (Tr. 43-44.)  Plaintiff testified that he then eats breakfast and either goes to Barlow or stays at home and plays video games, computer games, or surfs the Internet. (Tr. 49.)  Plaintiff testified that he does not have a girlfriend

nor has any friends whom he sees on a regular basis. (Tr. 44.)
Plaintiff testified that he goes to movies with his sister, cousins
or by himself. (Tr. 48.) Plaintiff testified that he does not
have a driver's license inasmuch as he failed the driving portion
of the driving exam. Plaintiff testified that he has his learner's
permit inasmuch as he passed the written portion of the exam. (Tr.
39-40.)

Plaintiff testified that he understood the purpose of the
hearing to be regarding the termination of his disability benefits.
Plaintiff testified that he continues to see a psychiatrist, but
that he did not know her location, for whom she works, or how long
he had been seeing her. (Tr. 41.) Plaintiff testified that he
visits his psychiatrist every three months and that she prescribes
medication for him. (Tr. 42.) Plaintiff testified that he has
been taking multiple medications since at least 2001 but that he
sometimes forgets to take a pill or sleeps too late to take any
medication for a given day. (Tr. 42-43.)

B.  Testimony of Plaintiff's Grandfather

Plaintiff's grandfather, Paul Friedman, testified at the
hearing in response to questions posed by counsel. Mr. Friedman
testified that he is plaintiff's legal guardian and that plaintiff
has lived with him since he was approximately seven years of age.
Mr. Friedman testified that plaintiff may have had fetal alcohol
syndrome upon his birth and that the circumstances of his early

childhood bear significantly upon plaintiff's current status. (Tr. 50-51.)

Mr. Friedman testified that plaintiff had no close friends. Mr. Friedman testified that plaintiff sometimes socializes with his cousins, but that his cousins do not want him around when they are with their friends because of plaintiff's inappropriate remarks and poor behavior. Mr. Friedman testified that plaintiff makes inappropriate comments at home as well, and argues with everyone at home. Mr. Friedman testified that it would be unusual for plaintiff to help with chores at home, but that he sometimes does so when asked. (Tr. 51-52.)

Mr. Friedman testified that plaintiff lost his job at Marciano's because he always argued with his manager and questioned why he was being asked to perform certain duties. Mr. Friedman testified that he did not believe plaintiff was able to work on even a part-time basis because he does not get along with anyone. Mr. Friedman testified that plaintiff would have to be alone to be productive. (Tr. 53.)

### III. Medical, Counselor, School, and Disability Records

Plaintiff was admitted to Hawthorn Children's Psychiatric Hospital on September 25, 2000, and was discharged on April 20, 2001. (Tr. 630-31.) Upon discharge, it was noted that plaintiff's

current medications were Tenex,[1] Adderall[2] and Prozac,[3] and that plaintiff would be seen by psychiatrist Dr. Laronda Jones. A case manager was also assigned to assist in plaintiff's aftercare plan, which included continuing medications, attending school, exhibiting appropriate classroom behavior, and participating in family therapy. (Tr. 630.)

On May 19, 2001, plaintiff visited Dr. Jones for initial evaluation. (Tr. 641-42.) It was noted that plaintiff had a long psychiatric history, had been neglected as a child in Israel and was removed from his parents, after which plaintiff's grandfather brought him to the United States. It was noted that plaintiff's parents now reside in the United States and that plaintiff communicates with them by telephone and sometimes visits them. It was noted that plaintiff had been admitted to Hawthorn for eight months for trouble he experienced with defiance, arguing and not doing his work at school. Dr. Jones noted plaintiff to have been discharged in April 2001 but that plaintiff's grandfather reported no improvement in plaintiff's condition. Plaintiff reported that

---

[1]Tenex (Guanfacine) is indicated in the management of hypertension. <u>Physicians' Desk Reference</u> 2719 (55th ed. 2001).

[2]Adderall is an amphetamine product indicated as part of a total treatment program for Attention Deficit Disorder with Hyperactivity. <u>Physicians' Desk Reference</u> 3034 (55th ed. 2001).

[3]Prozac (Fluoxetine) is indicated for the treatment of depression and for the treatment of obsessions and compulsions in patients with obsessive-compulsive disorder. <u>Physicians' Desk Reference</u> 1127-28 (55th ed. 2001).

his grandparents complain about "the smallest things." Dr. Jones noted plaintiff to be a junior in high school and to be getting average grades. It was noted that plaintiff's academics were fine, but that plaintiff had problems getting along with peers, siblings and authority. Plaintiff reported having no problems falling asleep or with his appetite. (Tr. 641.) Mental status examination showed plaintiff to be cooperative and happy. Plaintiff's speech and psychomotor skills were noted to be normal. Plaintiff's affect was full. Plaintiff's insight and judgment were noted to be fair, and recent and remote memory were noted to be intact. Dr. Jones diagnosed plaintiff with Tourette's Disorder, traits of Obsessive Compulsive Disorder (OCD), Depressive Disorder not otherwise specified, and Oppositional Defiant Disorder (ODD), and assigned a Global Assessment of Functioning (GAF) score of 50. Plaintiff was instructed to continue on his current medications. (Tr. 642.)

Plaintiff returned to Dr. Jones on June 22, 2001, who noted plaintiff and his grandfather to always be agitated with each other and to never seem to agree about anything. Plaintiff reported that he was sleeping okay and that his appetite was good. Plaintiff reported his grades to be fair and that he will pass but may not graduate with the next class. Plaintiff had no suicidal or homicidal ideations, nor any evidence of psychosis. Dr. Jones continued in her diagnoses of Tourette's, OCD, ODD, and Depression. Plaintiff was instructed to continue with his medications and to

return in three months for follow up. (Tr. 640.)

On September 28, 2001, plaintiff reported to Dr. Jones that he was doing well in school but that he continued to have the same problems at home. Plaintiff reported that he has been feeling happy. Plaintiff reported that this should be his last year in school and that he planned to study 3-D animation. Dr. Jones continued in her diagnoses of Tourette's and OCD and instructed plaintiff to continue with his medications. Plaintiff was instructed to follow up in three months. (Tr. 639.)

On December 14, 2001, plaintiff reported to Dr. Jones that he had been doing well during the previous three months and that he was on the honor roll. Plaintiff reported no significant trouble at school or at home, but that his grandfather "fusses" about him doing his chores and needing to get a job. Plaintiff reported his sleep and appetite to be stable. Dr. Jones continued in her diagnoses of Tourette's and OCD and instructed plaintiff to continue with his medications. Plaintiff was instructed to follow up in three months. (Tr. 639.)

Plaintiff saw Dr. Jones briefly on March 22, 2002, who noted plaintiff to be stable. Plaintiff was instructed to continue on his current medications. (Tr. 638.)

On May 3, 2002, plaintiff reported to Dr. Jones that he was doing well, but that he was having more trouble with kids at school. Plaintiff reported that he felt like he wanted to fight

with his peers who have been picking on him. It was noted that plaintiff was to start counseling at Provident Counseling. Dr. Jones continued in her diagnoses of Tourette's and OCD and instructed plaintiff to continue with his medications. Plaintiff was instructed to follow up in September. (Tr. 638.)

On May 18, 2002, plaintiff underwent an evaluation for Attention Deficit Disorder at Neuropsychological Diagnostics, Inc., upon referral by the Missouri Division of Vocational Rehabilitation. (Tr. 650-59.) It was noted that plaintiff was seeking evaluation for Attention Deficit with Hyperactivity Disorder (ADHD) to obtain assistance in financing college. It was also specifically noted that plaintiff's grandfather was present for the evaluation and provided most information. It was noted that plaintiff did not take his prescribed Adderall and Tenex as instructed for purposes of the evaluation. (Tr. 650.) Plaintiff's social and family history was noted. Mr. Friedman reported that plaintiff gets along well with his sisters, and plaintiff reported that he has trouble with relationships with others, admitting to past temper problems. It was reported that plaintiff had received psychiatric treatment and counseling since childhood and that plaintiff began receiving special education services after third grade. Plaintiff's admission to Hawthorn was noted, as well as plaintiff's successful performance in school since discharge. Mr. Friedman reported that plaintiff had "made a remarkable turn

around." Plaintiff reported his best subject to be math.
Plaintiff reported that he would like to attend college for 3-D
computer animation to which Mr. Friedman responded that he had a
difficult time picturing plaintiff in college inasmuch as he will
not open a book. (Tr. 651.) Plaintiff reported that his OCD
includes compulsions, such as straightening; and that his
Tourette's disorder includes a vocal tic, which was observed by the
evaluator. Plaintiff described his current mood as anxious most of
the time. Plaintiff was observed to be friendly, cooperative and
motivated, but seemed somewhat impulsive and immature for his age.
Plaintiff's mood and affect were noted to be anxious. Plaintiff's
attention was noted to be generally focused, but he was observed to
be fidgety. Plaintiff approached tasks adequately, appeared self-
confident and accepted failure. (Tr. 652.) Plaintiff was
administered the Wechsler Adult Intelligence Scale-III (WAIS-III),
the Woodcock-Johnson Test of Achievement-Revised, the Wechsler
Memory Scale-III (WMS-III), the Working Memory Index, the Connors'
Continuous Performance Test, and a Personality Profile (PAI) (Tr.
652-55), from which the following conclusions were made:

> This is a bright young man with many problems.
> Current testing reveals intellectual function-
> ing placing in the High Average range, with
> notable strengths for abstract/visual
> reasoning. Memory is low average to average,
> and is significantly lower than IQ based
> expectation. Specific learning disabilities
> were demonstrated in mathematics and written
> expression; and although not clearly a

learning disability, his reading comprehension is markedly lower than his IQ. Although attention problems were reported on the Brown ADD Scale, they were not exhibited on behavioral observation, Working Memory Indices, or the CPT. However, his PAI suggested psychological symptomatology, and he reported being diagnosed with several psychiatric disorders including – Obsessive Compulsive Disorder, Tourettes Syndrome, Oppositional Defiant Disorder. Overall, it is felt that Tourettes and his psychological problems interfere with his attention, and thus, ADHD is not the basic cause of attention problems that they reported. His memory, however, is considerably below his intellectual ability; and given his near drowning and unconsciousness [at age four] and drug/alcohol use by his mother during her pregnancy, memory and behavioral problems may be long term results. Then, as for his learning ability, while he was foreign born, he came to this country at age 3 and lived with grandparents and all speak English well; therefore, given his high IQ, it would be expected that his achievement levels would be commensurate with his intellectual level, but most are markedly lower pointing to learning disabilities, NOS.

(Tr. 655.)

It was opined that other functional limitations to be addressed for occupational success were various behaviors as described by plaintiff's grandfather, such as poor planning and organization, difficulty following instructions, poor attention to detail, and poor follow through. (Tr. 650, 656.) Plaintiff was diagnosed with Amnestic Disorder; Learning Disorder, NOS; Obsessive Compulsive Disorder (by self report); Oppositional Defiant Disorder (by self report); and Tourette's Disorder (by report). Plaintiff was

assigned a GAF score of 50. (Tr. 656.)

Plaintiff graduated from high school on June 2, 2002, with a cumulative grade point average of 2.60. Plaintiff ranked 163 out of 225 students. (Tr. 625.) In plaintiff's junior and senior year of high school, plaintiff obtained A and B grades in English, Math and Science; A, B and C grades in Social Studies; and three A's, seven B's, four C's, and two D's in various elective courses. (Tr. 626.)

On July 30, 2002, plaintiff completed a Disability Report for Disability Determinations (Tr. 581-90) in which he reported that his current impairments were ODD, ADHD and Tourette's Syndrome which resulted in his inability to obey, inattention, and constant tics. Plaintiff reported that he has suffered such impairments since childhood. Plaintiff reported that his previous employment had been terminated in October 2001 because of his failure to follow instructions. (Tr. 582.) Plaintiff reported that he is prescribed medication and undergoes counseling for his impairments. (Tr. 584-85, 587.) Plaintiff also reported that he was currently participating in vocational rehabilitation services provided by MERS Goodwill. (Tr. 588.)

Plaintiff visited Dr. Jones on September 13, 2002, who noted plaintiff to be looking for a job. It was noted that plaintiff was participating in MERS at the time. It was noted that plaintiff's grandfather did not want plaintiff to go to an academic

school but rather wanted plaintiff to attend a technical school such as Ranken or Vatterott. Plaintiff's sleep and appetite were noted to be stable. It was noted that plaintiff had cut down on his medication. Plaintiff was diagnosed with Tourette's, OCD and ADHD and was instructed to continue on his medications as adjusted. Plaintiff was instructed to return in three months. (Tr. 637.)

In a report dated October 1, 2002, plaintiff's physician, Dr. Robert H. Strashun, reported to Disability Determinations that plaintiff had been diagnosed with Post-Traumatic Stress Disorder and Tourette's Syndrome, and that plaintiff's last physical examination was in August 2000, which was normal. (Tr. 662.)

On October 1, 2002, Shelley Brockman Smith completed a Teacher Questionnaire for Disability Determinations. (Tr. 617-24.) Ms. Smith reported that she was plaintiff's teacher for four years at Ladue Horton Watkins High School in the areas of math and study skills and that plaintiff received special education services on a daily basis. Ms. Smith reported that reading was plaintiff's strength and that plaintiff's performance in math was very weak. As to acquiring and using information, Ms. Smith reported that plaintiff had serious or very serious problems in seven of ten areas of activity, specifically noting plaintiff not to be an independent learner and that he received many hours of support. It was noted that plaintiff's last year at school was spent in the Collaborative School, successfully earning credits via computer.

(Tr. 618.) As to attending and completing tasks, Ms. Smith reported that plaintiff had serious to very serious problems in eleven of thirteen areas of activity, specifically noting that plaintiff received a lot of support. (Tr. 619.) With respect to interacting and relating with others, Ms. Smith reported plaintiff to have serious to very serious problems in six of thirteen areas of activity, specifically noting that plaintiff's educational placement changed from Ladue High School to Hawthorn Children's Psychiatric Hospital-School, back to Ladue High School, and then to Collaborative School from which plaintiff graduated. (Tr. 620.) Ms. Smith reported almost all of plaintiff's speech to be understandable and that plaintiff had no problems in moving about and manipulating objects. (Tr. 621.) With respect to plaintiff's ability to care for himself, Ms. Smith reported plaintiff to have serious problems in four of ten specific areas of activity. (Tr. 622.) Ms. Smith reported that plaintiff's functioning changed after taking medication and that plaintiff did not frequently miss school due to his illness. (Tr. 623.)

On October 2, 2002, plaintiff's grandfather completed a Daily Activities Questionnaire for Disability Determinations in which he reported that plaintiff was defiant and had limited concentration with certain activities, did not follow instructions or rules, was uncooperative, and suffered from Tourette's Syndrome. It was reported that plaintiff had only one friend and that he does

not try to get along with anyone.  (Tr. 593.)  In a Claimant Questionnaire completed by plaintiff and his grandfather that same date, it was reported that plaintiff had Tourette's Syndrome, ODD, Attention Deficit Disorder (ADD), and Depression.  It was reported that tension aggravates the conditions and that such conditions are aggravated constantly.  It was reported that nothing other than medication relieves the symptoms.  Plaintiff's current medications were reported to be Prozac, D-Amphetamine and Guanfacine, with such medications causing no side effects.  (Tr. 594.)  It was reported that plaintiff's daily activities were not affected by plaintiff's impairments, and that plaintiff's ability to sleep and care for himself were likewise not affected.  (Tr. 595.)  It was reported that plaintiff had no difficulty preparing meals and could perform all household chores with no help.  (Tr. 595-96.)  It was reported that plaintiff had difficulty following directions because of ODD. (Tr. 595.)  It was reported that plaintiff enjoyed computers, video games, and 3-D animation and modeling.  It was reported that plaintiff leaves his home sixty-percent of the time during the week, had no difficulties leaving home or being away from home, and could be away from home an entire day.  It was reported that plaintiff walks or takes the bus to go to work.  (Tr. 596.)  It was reported that plaintiff's relationships with friends, family and others had not changed.  (Tr. 597.)

On October 3, 2002, Clinical Therapist Steve Meinert from

Provident Counseling reported to Disability Determinations that plaintiff has received counseling since May 2002 with reports of having difficulty with relationships at home. Mr. Meinert reported that plaintiff had been diagnosed in the past with ADHD, ODD, Tourette's Syndrome, learning disability, behavior disorder, and OCD. Mr. Meinert reported plaintiff's medications to be Tenex for Tourette's, Prozec for Depression, and Adderall for ADHD. Mr. Meinert opined that,

> [b]ehaviorally, Isak displays disrespect and a lack of attachment to his immediate family members, as well as a lack of motivation, self-discipline and responsibility for his actions. These underdeveloped skills in the areas of socialization and independence will more than likely affect Isak in other areas of life such as occupational settings.

(Tr. 649.)

On November 25, 2002, plaintiff underwent a consultative psychological evaluation for Disability Determinations. (Tr. 643-647.) Dr. James D. Reid noted plaintiff's diagnoses of ADHD, ODD and Tourette's Syndrome, and that plaintiff's current medications were Prozac, Tenex and Adderall. Plaintiff reported that he has two younger sisters whom he gets along with "okay." (Tr. 643.) Plaintiff reported that he lives with his grandparents and survives on income from his grandparents and from his work.[4] Plaintiff

_____

[4]Dr. Reid made the following observation regarding plaintiff's grandfather who was present at the evaluation: "The grandfather's face was very red and he seemed rather arrogant and sat with his

reported that he had completed high school in special education classes making above-average grades, upon which Dr. Reid observed plaintiff and his grandfather to then argue about plaintiff's grades. It was noted that plaintiff currently participated in an apprenticeship program through MERS Goodwill where he works twenty hours a week as a 3-D modeler and animator. Direct mental status examination showed plaintiff's hygiene and grooming to be within normal limits. Plaintiff's attitude was noted to be cooperative and pleasant. Plaintiff's facial expression was alert and plaintiff's motor activity, posture and gait appeared to be within normal limits. Plaintiff's mannerisms and eye contact were likewise within normal limits. Plaintiff's ability to relate was noted to be spontaneous, coherent, relevant, and logical. (Tr. 644.) Dr. Reid noted plaintiff to cooperate well with the evaluation but that plaintiff and his grandfather argued with each other. (Tr. 645.) Dr. Reid noted no deficits in plaintiff's expressive or receptive language abilities. Speed of speech was within normal limits and there was no pressure or push. There were no tangents, flight of ideas or perseveration. As to plaintiff's mood, plaintiff reported that he was always happy and that he has taken Prozac several years for Depression. Plaintiff's grandfather reported that plaintiff had been taking medication for so long, that he had forgotten what it was like when plaintiff was

eyes closed throughout most of the interview. When he got up he stumbled into the wall." (Tr. 644.)

depressed.  Plaintiff reported that he takes Tenex for Tourette's Syndrome and Dr. Reid opined that plaintiff "probably does have a history of [ODD]."  Dr. Reid again observed plaintiff and his grandfather to argue and observed Mr. Friedman's behavior to be "odd and arrogant."  Sensorium examination was within normal limits with plaintiff's current level of cognitive development judged to be at the formal operational stage.  Dr. Reid noted school records to show plaintiff's Verbal I.Q. to be 123, Performance I.Q. to be 129 and Full Scale I.Q. to be 127.  (Tr. 645.)  Plaintiff reported his activities of daily living to include spending time on the computer and the Internet, watching television, and participating in the apprenticeship program twenty hours a week preparing for job placement.  As to social functioning, plaintiff reported that he gets along with his family but that it is difficult.  Plaintiff reported that he has friends and gets along with people in general but that the more he knows a person, the more argumentative he becomes.  Plaintiff's grandfather reported that plaintiff is very argumentative, which is stressful.  Plaintiff reported that he is able to attend to his personal needs.  Plaintiff's concentration, persistence and pace were noted to be within normal limits.  Dr. Reid concluded:

> The overall clinical presentation appears to be a history of behavior disorder and Tourette's Syndrome.  He said he's been treated with Prozac for depression for a long time but he says he's always happy.  He may

have a dysthymic disorder. He may have Tourette's Syndrome. He appears to have an evolving personality disorder.

. . .

The claimant alleges an inability to work due to ADHD, oppositional defiant disorder and Tourette's Syndrome. Results of this examination fail to provide evidence of any significant psychological disorder that may lead to marked functional impairment.

(Tr. 646.)

Dr. Reid diagnosed plaintiff with Dysthymic Disorder, Tourette's Syndrome (provisional diagnosis), and Personality Disorder NOS. Dr. Reid assigned a GAF score of 80. (Tr. 646.) Dr. Reid recommended that plaintiff continue with vocational rehabilitation. As to the effect of plaintiff's impairment on his ability to perform work-related activities, Dr. Reid opined that plaintiff was slightly impaired in his ability to relate to others including fellow workers and supervisors, and in his ability to socially interact. Dr. Reid further considered plaintiff's ability to understand, remember and follow instructions; to maintain attention required to perform simple, repetitive tasks; to withstand the stress and pressure associated with day-to-day work activity; to adapt to new and novel situations; and to adequately cope with the stresses and strains of modern life, to be within normal limits. (Tr. 647.)

On January 10, 2003, Clinical Therapist Meinert from

Provident Counseling reported to Disability Determinations the same information, verbatim, as reported in his letter dated October 3, 2002. (Tr. 648.)

In a Support Needs Inventory completed January 10, 2003, for the Missouri Department of Mental Health, plaintiff reported that he was currently taking Fluoxetine, D-Amphetamine and Guanfacine, and that he had last had a physical examination in December 2001. (Tr. 601.) As to plaintiff's current living situation, it was noted that plaintiff lived with his grandparents and sisters and visited his father in New York every summer. Plaintiff reported being comfortable with his family, but plaintiff's grandfather reported his belief that plaintiff needed to learn to live on his own so that he could take responsibility for his life. It was noted that plaintiff had not been socially active but that he had recently begun to attend a computer club which led to an internship at a computer graphics company. As to self care, it was noted that plaintiff was independent but needed reminders. (Tr. 602.) Plaintiff reported that he likes computers, 3-D art, video games, and some sports, and that he would like to have a job doing 3-D computer graphics. Plaintiff's grandfather reported that plaintiff needed to socialize with others and be responsible, and that he needed a job he was motivated to perform. (Tr. 603.) It was noted that plaintiff was currently employed at Barlow Productions as an intern-apprentice arranged through MERS.

(Tr. 604.)  Areas of concern were noted to be budgeting, paying bills, hygiene, and socialization.  (Tr. 605.)  Plaintiff reported his desire to become employed doing computer art, to obtain a driver's license and to live independently with a roommate. Various strategies were outlined for plaintiff to obtain his goals within one year.  (Tr. 608-09.)

Plaintiff returned to Dr. Jones on January 31, 2003, who noted plaintiff to be a 3-D artist at Barlow.  It was noted that plaintiff had interned with Barlow through MERS and that he currently was working on a logo for the YMCA.  Plaintiff reported that his mood has been good and that he has been assuming more responsibility.  Plaintiff's grandfather reported that plaintiff's tics were worsening.  (Tr. 683.)  Mental status examination showed plaintiff's general appearance to be fair and his behavior cooperative.  Plaintiff's mood and affect were noted to be "OK." Flow and content of thought were noted to be goal-directed. Plaintiff's orientation, concentration, attention, memory, intellect, and judgment were noted to be intact.  Plaintiff was diagnosed with Tourette's Syndrome, OCD and ADHD.  Plaintiff was instructed to increase his dosage of Tenex and to continue with his other medications as prescribed.  (Tr. 684.)

In a letter addressed to "To Whom It May Concern" and dated May 12, 2003, Dr. Jones reported that she had been plaintiff's treating psychiatrist since May 2001 and that plaintiff

had been diagnosed with Depressive Disorder NOS, Tourette's Syndrome, ADHD, and possible Asperger's Disorder. (Tr. 635.) Dr. Jones noted plaintiff's medications to include Tenex, Adderall and Prozac, and reported that plaintiff relied heavily on his grandparents to assist him day to day. Dr. Jones reported that plaintiff had been receiving psychiatric services since he was a young child and that

> [h]is impulsivity and concentration make it difficult at times for him to make proper decisions and use rational judgment. It is in my opinion that he will be able to live on his own and handle is [sic] own financial concerns, in the future, with supervision. He will require assistance such as transitional living to achieve this independence. He would also benefit from vocational rehabilitation to help him secure some form of employment.
>
> In my professional opinion, Isak continues to remain disabled and should continue receiving benefits, as he is unable to maintain gainful employment at this time.

(Tr. 635.)

Plaintiff visited Dr. Jones on May 23, 2003, and reported that things were going fairly well. Dr. Jones noted that plaintiff's grandfather was not happy about plaintiff choosing not to work. It was noted that plaintiff spent most of his time fooling around. Plaintiff reported that his tics were not obvious to him but that his grandfather notices them. Plaintiff's mood, sleep and appetite were all noted to be stable. (Tr. 681.) Mental

status examination showed plaintiff's general appearance to be fair and his psychomotor activity, speech and behavior to be within normal limits. Plaintiff's mood was noted to be "OK" and he had a full affect. Dr. Jones noted plaintiff's flow and content of thought to be goal-directed. Plaintiff was alert and oriented. Dr. Jones noted that plaintiff's strength and asset was that he was healthy. Dr. Jones continued in her diagnoses of Tourette's Syndrome, OCD and ADHD, and instructed plaintiff to continue with his medications. (Tr. 682.)

Plaintiff, his grandfather and his case manager from Regional Center appeared at the Social Security Administration on May 27, 2003, and gave testimony before a Disability Hearing Officer in relation to plaintiff's request for the SSA to reconsider its determination to cease benefits. (Tr. 487-95.) At the hearing, the plaintiff testified that he currently worked as an intern for a video computer company, that he had done so the previous eight months, and that he had no difficulty performing the job tasks. Plaintiff testified that he did not know why he was unable to work but stated his main problem to be laziness. Plaintiff described himself as having "selective immaturity" and being irresponsible. Plaintiff reported his medication to help his ADHD condition. Plaintiff also reported that he receives treatment for Tourette's Syndrome and that he has no functional limitations due to the disorder. Plaintiff testified to no physical

limitations or restrictions, nor to any problems with communication. Plaintiff admitted to a strained relationship with his grandmother, but testified to a satisfactory relationship with his grandfather and sisters. Plaintiff testified that he has four close friends whom he contacts regularly and with whom he socializes, and that he gets along well with his co-workers. Plaintiff testified that he pursues computer-based recreational activities. (Tr. 488.) Plaintiff's grandfather testified that plaintiff is somewhat immature and irresponsible, and that he believed plaintiff not to be responsible enough to hold a job. Mr. Friedman testified that plaintiff was an expert in electronics and that he needed to go to school and get a job where he uses his brain, but that he continued to need support inasmuch as he lacked the emotional stability to deal with matters. (Tr. 488-89.) Marsha Heck, plaintiff's case manager, testified that she has worked with plaintiff on a monthly basis for approximately one year and that attempts were being made to move plaintiff from his grandparents' home to an apartment so that he may become more independent. Ms. Heck testified that plaintiff was nonchalant about doing things and lacked self-discipline. Ms. Heck testified that plaintiff sees things on his own terms and has difficulty setting goals for himself. Ms. Heck testified that plaintiff had potential for a good future with computers. (Tr. 489.)

On September 12, 2003, plaintiff returned to Dr. Jones

who noted plaintiff to continue to work for Barlow Productions as an intern and that he had received some compensation for his work. Plaintiff reported that his mood had been fine and that his sleep and appetite were stable. Dr. Jones noted that plaintiff was involved with a "productive living board" which was to help him with an independent living program. (Tr. 679.) Mental status examination showed plaintiff's general appearance to be fair and his psychomotor activity, speech and behavior to be intact. Plaintiff's mood and affect were noted to be "OK" and full. Dr. Jones notes plaintiff's flow and content of thought to be goal-directed. Plaintiff was alert and oriented, and plaintiff's concentration, attention, memory, intellect, insight, and judgment were noted to have improved. Plaintiff's strength and asset was noted to be his health. Dr. Jones continued in her diagnoses of Tourette's Syndrome, OCD and ADHD, and instructed plaintiff to continue with his medications. (Tr. 680.)

On December 10, 2003, Dr. Jones completed a checklist Mental Medical Source Statement (MSS) in which she reported plaintiff's current diagnoses to be Tourette's Disorder, OCD, and ADHD (combined type). (Tr. 669-72.) Dr. Jones opined that plaintiff's impairments resulted in marked limitations in plaintiff's activities of daily living and specifically in his ability to cope with normal work stress, to function independently, to behave in an emotionally stable manner, and to maintain

reliability. (Tr. 669.) In the area of social functioning, Dr. Jones opined that plaintiff had marked limitations in his ability to relate in social situations, to interact with the general public, and to maintain socially acceptable behavior. Dr. Jones opined that plaintiff was extremely limited in his ability to accept instructions and respond to criticism. In the area of concentration, persistence or pace, Dr. Jones opined that plaintiff had moderate limitations in his ability to understand and remember simple instructions, and to make simple work-related decisions. Dr. Jones further opined that plaintiff had marked limitations in his ability to maintain regular attendance and be punctual, to complete a normal workday and workweek without interruptions from symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to sustain an ordinary routine without special supervision, to respond to changes in work setting, and to work in coordination with others. Dr. Jones further opined that plaintiff had extreme limitations in his ability to maintain attention and concentration for extended periods. (Tr. 670.) Dr. Jones reported that plaintiff suffered one or two episodes of decompensation within the past year that lasted at least two weeks. Dr. Jones determined plaintiff's impairments to have resulted in a substantial loss of plaintiff's ability to understand, remember and carry out simple instructions; to make judgments that are commensurate with the functions of unskilled work; to respond

appropriately to supervision, co-workers and usual work situations; and to deal with changes in a routine work setting. (Tr. 671.) Dr. Jones reported plaintiff's current GAF score to be 60. (Tr. 672.) Dr. Jones opined that plaintiff's limitations, as reported, have lasted or were expected to last at least twelve continuous months. (Tr. 671.)

Plaintiff returned to Dr. Jones on January 9, 2004, who noted plaintiff to have been kicked out of his military program for fighting and goofing off. Dr. Jones noted plaintiff's maturity level to be low. (Tr. 678.)

### IV. The ALJ's Decision

The ALJ found that plaintiff had never engaged in substantial gainful activity. The ALJ found plaintiff to have Dysthymic Disorder, Personality Disorder-not otherwise specified, and Tourette's Syndrome (provisional), but that such impairments, either singly or in combination, did not meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found the allegations of symptoms precluding all types of work activity not to be consistent with the evidence and thus not persuasive. The ALJ found plaintiff's impairments to preclude extremely frequent and direct interaction with the public; and that plaintiff had no more than mild limitations with regard to daily activities, concentration, persistence, pace, attention, and working without decompensation. The ALJ found plaintiff not to

have any past relevant work. The ALJ found that given plaintiff's age, education and residual functional capacity (RFC), Medical-Vocational Rule 204.00 of Appendix 2, Subpart P, Regulations No. 4 demonstrated that plaintiff could perform work existing in significant numbers. The ALJ found plaintiff's non-exertional limitation not to substantially reduce the range of heavy work plaintiff could perform. The ALJ concluded that plaintiff has been able to perform substantial gainful activity and to perform work existing in significant numbers since at least December 15, 2002, and thus not under a disability at any time since December 15, 2002. (Tr. 27-28.)

## V. Discussion

For claimants determined to be under a disability as a child and thus awarded disability benefits, the Commissioner must redetermine the claimant's eligibility for benefits upon the claimant's attainment of eighteen years of age. 20 C.F.R. § 416.987(a). When conducting this age-eighteen redetermination, the Commissioner does not examine whether there has been medical improvement in the claimant's condition, but instead must use the initial adult eligibility rules applicable to adult applicants. 20 C.F.R. § 416.987(b). As such, the familiar five-step sequential evaluation process is employed to determine whether, upon attaining age eighteen, the claimant is disabled. Id.; see 20 C.F.R. § 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001). To determine

whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

    1.    The credibility findings made by the ALJ.

    2.    The plaintiff's vocational factors.

    3.    The medical evidence from treating and consulting physicians.

    4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

    5.    Any corroboration by third parties of the plaintiff's impairments.

    6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068(8th Cir. 2000)). If substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in

the record that would have supported a contrary outcome or because another court could have decided the case differently.  <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001).

Plaintiff claims that the Commissioner's decision here is not supported by substantial evidence on the record as a whole and specifically, that the ALJ erred in his analysis in determining plaintiff's RFC inasmuch as he appeared to base such determination solely on his adverse credibility determination; improperly reevaluated evidence developed prior to December 2002-the period during which it is not disputed that plaintiff was under a disability; and improperly weighed the medical evidence and particularly, erred in according substantial weight to the opinion of consulting physician Dr. Reid, and erred in relying on only Dr. Jones' treatment notes to support a finding that plaintiff could engage in work activities.  Plaintiff also claims that the ALJ erred in his analysis of plaintiff's medically determinable impairments and specifically, that the ALJ improperly substituted his opinion for those rendered by treating and examining physicians, counselors and teachers.  Finally, plaintiff claims that the ALJ erred in failing to elicit testimony from a vocational expert inasmuch as plaintiff suffers from non-exertional limitations affecting his functional ability to perform the full range of work.

A.  Residual Functional Capacity

        Residual functional capacity is what a claimant can do
despite his limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039
(8th Cir. 2001).  The ALJ bears the primary responsibility for
assessing a claimant's RFC based on all relevant, credible evidence
in the record, including medical records, the observations of
treating physicians and others, and the claimant's own description
of his symptoms and limitations.  Goff v. Barnhart, 421 F.3d 785,
793 (8th Cir. 2005); 20 C.F.R. § 416.945(a).  A claimant's RFC is
a medical question, however, and some medical evidence must support
the ALJ's RFC determination.  Hutsell v. Massanari, 259 F.3d 707,
711-12 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 703-04 (8th
Cir. 2001).  An ALJ's RFC assessment which is not properly informed
and supported by some medical evidence in the record cannot stand.
Hutsell, 259 F.3d at 712.

    1.  *Reliance on Credibility Determination*

        Plaintiff claims that in finding plaintiff to have the
RFC to perform work-related activities, the ALJ improperly relied
on his adverse credibility determination regarding the allegations
of plaintiff's disabling symptoms.  Plaintiff specifically notes
that he is not challenging the ALJ's credibility determination
itself in the instant cause (Pltf.'s Brief at p.13 n.11), but
rather is arguing that the ALJ committed legal error by relying on
such determination rather than properly weighing the medical

evidence of record. For the following reasons, plaintiff's argument must fail.

A review of the ALJ's decision shows his determination of plaintiff's ability to perform work-related activities to have been based upon his consideration of the entire record as a whole and not solely upon his determination of the credibility of subjective complaints. Indeed, the ALJ thoroughly discussed all the evidence of record, including results of diagnostic tests; observations and reports of plaintiff's treating physicians, counselors and teachers; observations and reports of consulting physicians; and plaintiff's and other witnesses' descriptions of plaintiff's symptoms and limitations, see Goff, 421 F.3d at 793; 20 C.F.R. § 416.945(a), and accorded appropriate weight thereto (see, e.g., discussion infra at Section V.A.3).

Inasmuch as the ALJ's determination of plaintiff's RFC was based upon a review of all the evidence of record and did not hinge solely upon his finding that the allegations regarding plaintiff's limitations were not credible, plaintiff's claim that the ALJ improperly relied upon his adverse credibility finding in making the RFC determination is without merit.[5]

_____

[5]Although plaintiff does not challenge the ALJ's credibility determination here, a review of the ALJ's decision nevertheless shows that, in a manner consistent with and as required by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted), the ALJ thoroughly considered the subjective allegations of plaintiff's disabling symptoms on the basis of the entire record before him and set out numerous inconsistencies detracting from the credibility of such allegations. The ALJ may disbelieve subjective

2. *Pre-December 2002 Evidence*

On February 18, 1997, when plaintiff was twelve years of age, an application for childhood disability benefits was filed on his behalf upon which the SSA applied the rules governing childhood disability and made an initial determination on April 2, 1997, that plaintiff was disabled and thus entitled to the receipt of such benefits. (Tr. 56-61.) Through periodic review conducted pursuant to 20 C.F.R. §§ 416.989, et seq., the SSA determined on January 5, 2000, that plaintiff continued to qualify for disability benefits under the rules governing childhood disability. (Tr. 356-62.) Plaintiff was fifteen years of age at the time of such review and determination. Upon plaintiff reaching eighteen years of age in July 2002, the SSA commenced the age-eighteen redetermination process of evaluating plaintiff's disability status, applying to plaintiff for the first time, as required, the rules governing disability for adults. See 20 C.F.R. § 416.987(a)-(c). With this redetermination process, the SSA determined plaintiff not to be disabled as an adult and terminated plaintiff's receipt of benefits. Plaintiff was notified of this determination on December 6, 2002, wherein, in accordance with 20 C.F.R. § 416.987(e),

---

complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).

plaintiff was informed that his disability would be considered to cease December 15, 2002.[6]

As set out _supra_ at Section V.A.1, the ALJ addressed the evidence contained in the record and determined plaintiff not to be disabled as an adult since at least December 15, 2002. Much of the evidence addressed by the ALJ in his written decision consisted of that developed prior to December 2002, including, but not limited to, plaintiff's school records, Dr. Reid's consultative examination, and Dr. Jones' treatment notes. Plaintiff claims that the doctrines of <u>collateral estoppel</u> and <u>res judicata</u> legally barred the ALJ's reevaluation of such pre-December 2002 evidence to find plaintiff not disabled, however, inasmuch as no dispute exists that plaintiff was disabled during that period, that is, up to December 2002. For the following reasons, plaintiff's argument is misplaced.

For the doctrines of <u>collateral estoppel</u> and <u>res judicata</u> to bar subsequent litigation of issues and claims, it is well settled that the issues and/or claims presented in the subsequent litigation must be identical to those decided and/or adjudicated in the prior litigation and that the prior adjudication resulted in a final judgment on the merits. <u>Canady v. Allstate Ins. Co.</u>, 282

------

[6]"If we find that you are not disabled, we will find that your disability ended in the earliest of: (1) The month the evidence shows that you are not disabled under the rules in this section, _but not earlier than the month in which we mail you a notice saying you are not disabled._" 20 C.F.R. § 416.987(e) (emphasis added).

- 36 -

F.3d 1005, 1014-16 (8th Cir. 2002). In this cause, there has never been a final determination, other than the one currently under review, that plaintiff's impairments and the limitations caused thereby qualified him for the receipt of disability benefits under the rules governing *adult* eligibility. Cf. Drummond v. Commissioner of Soc. Security, 126 F.3d 837 (1997) (in addressing subsequent application for adult disability benefits on same evidence adduced on prior application for adult benefits, res judicata barred ALJ from making findings contrary to those previously made which would have provided a favorable result on the subsequent application). Nor has the SSA ever attempted to redetermine that plaintiff did not qualify for childhood disability benefits subsequent to a final determination that he was so qualified. Plaintiff's argument, therefore, that the doctrines of res judicata and collateral estoppel barred the ALJ's action in this cause is without merit.

Plaintiff also argues that 42 U.S.C. § 405(h) likewise prohibited the ALJ from considering the pre-December 2002 evidence inasmuch as such statute provides that "[t]he findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing." Such reliance on § 405(h) is without merit here, however, inasmuch as there has never been a hearing on plaintiff's eligibility for adult disability benefits upon which the Commissioner made findings

and entered a decision, other than that currently under review.

Further, if the Court were to adopt plaintiff's reasoning that in an age-eighteen redetermination case an ALJ may never consider evidence developed prior to the date the disability is determined to have ceased, the SSA's redetermination process itself would be rendered virtually meaningless. In age-eighteen redetermination cases such as this one, the Regulations provide in relevant part that if the Commissioner finds the claimant not to be disabled, "we will find that your disability ended in the earliest of: (1) The month the evidence shows that you are not disabled under the rules in this section, *but not earlier than the month in which we mail you a notice saying that you are not disabled*." 20 C.F.R. § 416.987(e) (emphasis added). Under this provision, a claimant's disability will never be determined to have ceased prior to the period within which he is notified of such determination by the SSA. It is necessary, therefore, for the SSA to review evidence developed prior to the claimant's determined cessation of disability so that it may make its finding *prior* to communicating such finding to the claimant as required by the Regulations.

The undersigned agrees that the Commissioner is barred from relitigating an issue that has been previously determined. See Drummond, 126 F.3d at 842. However, the issue as to whether plaintiff is disabled as an adult has never been litigated prior to the Commissioner's age-eighteen redetermination conducted in this

cause, and thus has never been previously determined. The finality doctrines of <u>res</u> <u>judicata</u>, <u>collateral</u> <u>estoppel</u> and 42 U.S.C. § 405(h) thus do not come into play in this cause. Accordingly, the ALJ did not commit legal err in considering evidence obtained prior to December 2002 in determining plaintiff not to be disabled under the rules governing adult disability.

3.  *Weight Given to Medical Evidence*

Plaintiff argues that the ALJ improperly weighed the medical evidence by according substantial weight to the opinion of consulting physician Dr. Reid, and relying on only Dr. Jones' treatment notes to support a finding that plaintiff could engage in work activities.

The Regulations require the Commissioner to give more weight to the opinions of treating physicians than other sources. 20 C.F.R. § 416.927(d)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. <u>Id.</u> This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the
> medical professionals most able to provide a
> detailed, longitudinal picture of [a
> claimant's] medical impairment(s) and may
> bring a unique perspective to the medical

> evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

Id.

As such, evidence received from a treating physician is generally accorded great weight with deference given to such evidence over that from consulting or non-examining physicians. See Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992); Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991).

Opinions of treating physicians do not *automatically* control in determining disability, however, inasmuch as the Commissioner is required to evaluate the record as a whole. Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004). When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion. 20 C.F.R. § 416.927(d)(2). Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for her findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. Id. The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to

the] treating source's opinion." <u>Id.</u>

With respect to the opinions of one-time consulting physicians, such opinions are generally not considered to be substantial evidence, "especially if the treating physician contradicts the consulting physician's opinion." <u>Charles</u>, 375 F.3d at 783. Where there exists such a contradiction between the opinions of a one-time consultant and a treating physician, the ALJ must resolve the conflict between those opinions. <u>Cantrell v. Apfel</u>, 231 F.3d 1104, 1107 (8th Cir. 2000). An ALJ may credit a one-time consultant and discount a treating physician's opinion "(1) where [the one-time] medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." <u>Anderson v. Barnhart</u>, 344 F.3d 809, 812-13 (8th Cir. 2003) (internal citation and quotation marks omitted).

a. *Treating Psychiatrist, Dr. Jones*

In his written decision, the ALJ thoroughly discussed the treatment rendered by plaintiff's treating psychiatrist, Dr. Jones, as well as her observations and diagnoses of plaintiff's impairments throughout such treatment. (Tr. 15, 19-20.) The ALJ specifically noted the observations made in Dr. Jones' treatment notes that plaintiff was doing well at school and achieving good grades; that plaintiff's primary problems occurred at home and

particularly with his grandfather who "fussed" at him about work and chores; that plaintiff was seeking employment and subsequently obtained work as an intern at Barlow Productions for which he sometimes received compensation; that plaintiff was taking on more responsibility; that plaintiff's appetite and sleep were stable; that plaintiff continually reported his mood to be "good" or "fine"; that no significant adjustments in medications were required; that no observations of significant anxiety or depression, tics, intrusive thoughts, nightmares, compulsive behavior, emotional distress, etc., were recorded; and that mental status examinations continually showed the relevant areas of plaintiff's behavior to be goal-directed, intact and/or within normal limits.

Against this actual treatment background, the ALJ reviewed Dr. Jones' letter of May 2003 in which she opined that plaintiff continued to be disabled and could not maintain employment given his impulsiveness, deficits in concentration, and difficulty in making proper decisions; and Dr. Jones' MSS of December 2003 wherein she opined that plaintiff had marked or extreme limitations in nearly every level of functioning. The ALJ determined to accord little weight to such opinions. For the following reasons, this determination by the ALJ was not error.

First, the ALJ properly noted that the issue as to whether a claimant is disabled for purposes of Social Security is

one reserved to the Commissioner and is outside the province of medical sources. See Smallwood v. Chater, 65 F.3d 87, 89 (8th Cir. 1995); Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991). Therefore, the ALJ's refusal to rely upon Dr. Jones' statement that plaintiff was disabled and could not be gainfully employed was not error. Turley v. Sullivan, 939 F.2d 524, 527 (8th Cir. 1991). The ALJ also properly determined to accord little weight to Dr. Jones' stated opinions inasmuch as they appeared to be "extremely inconsistent with, and unsupported by, her own treatment notes" as well as with other substantial evidence on the record which indicated the absence of any significant limitations of function. (Tr. 24.) A review of the record shows such determination not to be error inasmuch as Dr. Jones did not provide any support for her opinions of disabling limitations and further, as found by the ALJ, such opinions are wholly inconsistent with her own findings and observations made throughout her treatment of plaintiff. An ALJ's decision to discount a treating physician's MSS is not error where the limitations listed therein "stand alone" and were "never mentioned in [the physician's] numerous records or treatment" nor supported by "any objective testing or reasoning." See Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001); see also Randolph v. Barnhart, 386 F.3d 835, 841 (8th Cir. 2004) (only evidence that claimant met criteria for disability was treating source's cursory checklist); Sultan v. Barnhart, 368 F.3d 857, 863-64 (8th Cir.

2004) (no error in rejecting treating physician's statement that claimant had no real ability to function in numerous areas relevant to employment given evidence in treatment notes that claimant was doing well on medication and was functioning at a reasonable level at school and at home); Strongson v. Barnhart, 361 F.3d 1066, 1071 (8th Cir. 2004) (affirming ALJ's decision to give little weight to MSS where physician's opinion was "without explanation or support from clinical findings" and "not internally consistent with [his] own treatment notations."). The ALJ also found Dr. Jones' MSS to be inconsistent within itself inasmuch as throughout the Statement, Dr. Jones repeatedly opined that plaintiff had marked and/or extreme limitations of functioning throughout the various domains, but then concluded that plaintiff's GAF score was 60, which, as noted by the ALJ, demonstrates only moderate symptoms according to the Diagnostic and Statistical Manual of Mental Disorders. (Tr. 25.)

As demonstrated above, the ALJ gave good reasons to give little weight to Dr. Jones' May 2003 letter and December 2003 MSS, and did not err in this determination. Plaintiff's claim that the ALJ erred by looking only to Dr. Jones' treatment notes and not her statements of disability in determining plaintiff's RFC, therefore, must fail.

b. *Consulting Psychologist, Dr. Reid*

In his written decision, the ALJ thoroughly addressed all

the relevant evidence of record, including plaintiff's school records, medical and psychiatric treatment and examinations, counseling, and plaintiff's and other witnesses' accounts of plaintiff's functional abilities and limitations. With respect to the examination, observations and report of consulting physician Dr. Reid, a review of the ALJ's decision shows him to have discussed such examination in significant detail and to ultimately find Dr. Reid's resulting assessment of plaintiff's functioning to be consistent with the other evidence of record and therefore entitled to greater weight. Such determination was not error.

In his assessment of plaintiff's functional abilities, Dr. Reid opined that plaintiff's abilities to relate to others and to socially interact were slightly limited. Dr. Reid further opined that plaintiff's abilities to understand, remember and follow instructions; to maintain attention required to perform simple, repetitive tasks; to withstand the stress and pressure associated with day-to-day work activity; to adapt to new and novel situations; and to adequately cope with the stresses and strains of modern life, were within normal limits. Although Dr. Reid did not have the same treating relationship that Dr. Jones had with plaintiff, his assessment of plaintiff's functional abilities does not appear to be "tainted with the apparent inconsistencies" demonstrated in Dr. Jones' assessments. See Anderson, 344 F.3d at 813. On this basis, the ALJ was permitted to credit Dr. Reid's

report over that of Dr. Jones.  Id.  Indeed, as noted by the ALJ, Dr. Reid specifically observed that plaintiff generally got along with others; was cooperative and pleasant; exhibited hygiene and grooming within normal limits; was alert; displayed motor activity and mannerisms within normal limits; was able to relate in a spontaneous, coherent, relevant, and logical manner; showed no deficits in his expressive or receptive language abilities; displayed speed of speech within normal limits with no pressure or push; demonstrated no tangents, flight of ideas or perseveration; reported that he was always happy; demonstrated cognitive development at the formal operational stage; reported significant daily activities and that he can attend to his personal needs; and demonstrated concentration, persistence and pace within normal limits.  The ALJ noted such observations to be consistent with other substantial evidence on the record, including, but not limited to, plaintiff's testimony before the Disability Hearing Officer; evidence of plaintiff's ability to engage in work activity through his internship; evidence that plaintiff's impairments were controlled through medication and treatment; plaintiff's unlimited ability to engage in sports, computer work, and video games; plaintiff's ability to obtain intelligence scores in the high average range; and the lack of any clinical observations, including from Dr. Jones, that plaintiff exhibited significant behavioral or emotional deficits, significant cognitive deficits, thought

blocking or thought processing deficits, or significant social deficits.

Because Dr. Reid's opinion as to plaintiff's functional abilities was consistent with his own observations and examination of plaintiff, and was consistent with other substantial evidence on the record as a whole, the ALJ did not err in according greater weight to Dr. Reid's opinion, including over that rendered by Dr. Jones in her functional assessment(s). <u>Anderson</u>, 344 F.3d at 813; <u>Hogan</u>, 239 F.3d at 961.

B.  <u>Medically Determinable Impairments</u>

Plaintiff contends that the ALJ erred in his evaluation of what constitutes a medically determinable impairment, as demonstrated by his statement that plaintiff's asserted claims of "selective immaturity" and "laziness" were not recognized medical diagnoses.  Plaintiff argues that the ALJ failed to recognize that such characteristics are symptoms of plaintiff's diagnosed conditions of Dysthymic Disorder and Antisocial Personality Disorder and thus that the ALJ's dismissal of such symptoms as non-medical conditions was an improper substitution of his own opinion for that of plaintiff's physicians.

The ALJ found the record to show that plaintiff had Dysthymic Disorder and Personality Disorder, but that plaintiff was capable of working.  To support this finding, the ALJ acknowledged plaintiff's and his grandfather's reports of laziness and

"selective immaturity," but that such episodes of laziness and immaturity were within the control of plaintiff as demonstrated by plaintiff's ability to engage in sustained activities in which he *chose* to participate and/or which he enjoyed, such as computer work, video games and 3-D animation. The ALJ further noted that with medication, plaintiff's performance at school improved to the extent that plaintiff received A and B grades during his final years, and that plaintiff's social problems appeared to be centered around his agitated relationship with his grandparents. Impairments which can be controlled through medication and treatment cannot be considered disabling. Estes, 275 F.3d at 725. The ALJ also noted that plaintiff's perceived laziness and selective immaturity did not prevent him from performing well during intelligence testing, some of which was performed without plaintiff having taken his medication. As such, to the extent plaintiff exhibited laziness and selective immaturity, the ALJ found the record to show these characteristics not to rise to such a level that plaintiff would be prevented from engaging in work-related activities.

A review of the ALJ's decision in its entirety shows the ALJ not to have substituted his opinion for that of plaintiff's treating and/or consulting physicians. To the contrary, the ALJ fully discussed and analyzed the medical and other evidence of record, accorded it the weight it was due, and indeed found upon

such evidence that plaintiff suffered from the impairments which plaintiff now contends causes the symptoms which he claims the ALJ improperly discounted, _i.e._, Dysthymic Disorder and Personality Disorder. As set out above, however, the ALJ only discounted plaintiff's symptoms of laziness and selective immaturity to the extent plaintiff claimed that such characteristics in and of themselves constituted disabling impairments.

From a review of the ALJ's decision, it appears that the ALJ found the record to support plaintiff's assertions of laziness and selective immaturity. To the extent plaintiff claims that the ALJ failed to specifically acknowledge such characteristics to be symptomatic of Dysthymic Disorder and Antisocial Personality Disorder, such failure is of no instance in the instant cause inasmuch as the ALJ did in fact include Dysthymic Disorder and Personality Disorder among plaintiff's medically determinable impairments. The ALJ's finding that an isolated characteristic or two of such impairments did not rise, in and of themselves, to the level of medically determinable impairments nor were so severe as to prevent plaintiff from engaging in work-related activities, is not a basis upon which to reverse the ALJ's decision which is otherwise supported by substantial evidence on the record as a whole. See Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004) (administrative finding not required to be set aside when deficiency in opinion-writing technique has no bearing on outcome);

cf. Reeder v. Apfel, 214 F.3d 984, 988 (8th Cir. 2000) (must reverse where deficiency in opinion-writing technique is coupled with the ALJ's failure to address medical evidence and failure to resolve conflicts in the evidence).

Therefore, for the above reasons, plaintiff's argument that the ALJ's discussion relating to plaintiff's self-described laziness and selective immaturity shows him to have improperly substitute his opinion for those of medical sources and thus to have failed to properly evaluate plaintiff's medically determinable impairments, must fail.

C.   Vocational Expert

Plaintiff claims that the ALJ erred in failing to elicit the testimony of a vocational expert regarding plaintiff's ability to perform work existing in significant numbers in the national economy. Specifically, plaintiff argues that because the ALJ's RFC determination failed to include all of plaintiff's functional limitations given the ALJ's errors in evaluating the evidence of record, as argued above, his reliance on the Medical-Vocational Guidelines to find plaintiff not disabled constituted error. Plaintiff does not identify the specific functional limitations which he contends should have been included in the ALJ's RFC determination.

The Commissioner's burden to show that there exist jobs in the national economy that the claimant is capable of performing

may be met by reference to the Medical-Vocational Guidelines (Guidelines) if the claimant suffers only from exertional impairments. <u>Bolton v. Bowen</u>, 814 F.2d 536, 537 n.3 (8th Cir. 1987). Use of the Guidelines is also permissible where non-exertional impairments exist but "do not diminish or significantly limit the claimant's residual functional capacity to perform the full range of Guideline-listed activities[.]" <u>Ellis v. Barnhart</u>, 392 F.3d 988, 996 (8th Cir. 2005). Where a non-exertional impairment significantly diminishes the claimant's RFC, the Guidelines are not controlling and the ALJ must call a vocational expert or produce other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's abilities. <u>Id.</u>; <u>Shannon v. Chater</u>, 54 F.3d 484, 488 (8th Cir. 1995). The Eighth Circuit has provided some guidance in applying this standard:

> In this context "significant" refers to whether the claimant's non-exertional impairment or impairments preclude the claimant from engaging in the full range of activities listed in the Guidelines under the demands of day-to-day life. Under this standard isolated occurrences will not preclude use of the Guidelines, however persistent non-exertional impairments which prevent the claimant from engaging in the full range of activities listed in the Guidelines will preclude the use of the Guidelines to direct a conclusion of disabled or not disabled. For example, an isolated headache or temporary disability will not preclude the use of the Guidelines whereas persistent migraine headaches may be sufficient to

> require more than the Guidelines to sustain
> the [Commissioner's] burden.

Thompson v. Bowen, 850 F.2d 346, 350 (8th Cir. 1988).

The plaintiff here claims in a cursory manner that the ALJ's failure to properly evaluate the evidence resulted in the failure to include all of plaintiff's functional limitations in his RFC determination. As discussed supra at Sections V.A,B, however, the ALJ properly evaluated all the evidence of record and accorded it the weight it was due. Upon review of the credited evidence, the ALJ determined that to the extent plaintiff suffered non-exertional limitations, such limitations did not significantly compromise the range of exertional work activity that plaintiff can perform. (Tr. 26.) Where an ALJ properly discredits non-exertional impairments, the use of the Guidelines is permissible. See Patrick v. Barnhart, 323 F.3d 592, 596 (8th Cir. 2003).

Although plaintiff does not identify which functional limitations the ALJ allegedly improperly omitted from his RFC determination, a review of the ALJ's decision nevertheless shows him to have found that certain of plaintiff's perceived limitations caused by his impairments were intermittent in nature and considered to be exhibited by choice rather than by any uncontrollable impairment. It cannot be said, therefore, that such limitations are "significant" to the degree that they can be considered persistent non-exertional impairments which would

prevent plaintiff from engaging in the full range of activities listed in the Guidelines. <u>Thompson</u>, 850 F.2d at 350. As such, the ALJ did not err by failing to call a vocational expert in this cause.

## VI. Conclusion

A review of the ALJ's decision shows him to have thoroughly and thoughtfully addressed and analyzed the medical and other evidence in the record in his determination that plaintiff did not meet the criteria necessary to establish disability as an adult since at least December 15, 2002. For the reasons stated above, this determination by the ALJ is not error inasmuch as substantial evidence on the record as a whole supports the conclusion. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. <u>Gowell</u>, 242 F.3d at 796.

Because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that plaintiff was not under a disability as an adult since at least December 15, 2002, must be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the

Commissioner is affirmed and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.


_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE


Dated this _28th_ day of March, 2006.